UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JACQUELINE HARTMAN, ON BEHALF OF S.M. | * | CIVIL ACTION NO. 17-13712 |
| | * | |
| | * | SECTION: "B"(1) |
| VERSUS | * | |
| | * | JUDGE IVAN L. R. LEMELLE |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

<u>REPORT AND RECOMMENDATION</u>

The plaintiff, Jacqueline Hartman, on behalf of the minor S.M., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3). The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 13) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 14) be GRANTED.

**<u>Procedural Background</u>**

An application for SSI was filed on behalf of S.M. on September 22, 2014, asserting a disability onset date of October 10, 2008. The following illnesses, injuries, or conditions were alleged: asthma, sleep problems, ADHD, and migraines. On December 17, 2014, S.M.'s claim was denied by the state agency.

S.M. obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 1, 2016. On July 27, 2016, the ALJ issued an adverse decision. S.M. timely appealed to the Appeals Council, which denied review on September 25, 2017.

On November 29, 2017, plaintiff filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 10,11). The parties filed cross-motions for summary judgment. (Rec. Docs. 13,14). S.M. is represented by counsel.

### Evidence in the Record

Hearing Testimony:

A hearing was held before the ALJ on June 1, 2016, by video, with S.M., his attorney, and his mother,[1] Jacqueline Hartman, present in Humble, Louisiana, and the ALJ present in New Orleans. R. at 40, 42. S.M. was born October 10, 2007, and was 8 years old at the time of the hearing. R. at 69. Although S.M. was present, the ALJ was not able to ask him any questions. R. at 46-47. She observed that he was "slouched over and not really able to stay awake." R. at 47. The ALJ asked Hartman if this was typical, and she explained that his medication makes him drowsy, and after the medicine wears off he will wake up. R. at 47. Hartman testified that S.M. has drowsy spells like the one observed by the ALJ four days out of the week. R. at 48. She testified that the drowsiness began in September of 2015. R. at 55. She explained that the drowsy spells last about three hours. R. at 56-57. She testified that she must pick him up early from school about every other day and that he was out of school more than he was in school. R. at 58. Hartman said she had spoken to his doctors about his drowsiness, and they recommended Botox to try and get him off the medication. R. at 48.

Hartman testified that S.M. cannot really play or do activities like other children his age because of his headaches. R. at 49, 59. She said he cannot play football or basketball, because if he tries to do so a headache will start. R. at 52, 59. She said that he does not play video games and

---

[1] Hartman is S.M.'s adoptive mother.

that he lays in bed with the dog. R. at 62. She testified that he likes to have friends over every day. R. at 62. When he has a headache and children are over, he will lay in bed and the children will be in the house. R. at 63. She said he just likes the company. R. at 63.

Hartman testified that his doctors say there is nothing that can be done about his activity level and that they just try to give him more medicine to control his pain. R. at 50. She said that S.M. complains that his head hurts all the time. R. at 50. When S.M. is having a headache, he is irritated by light and sound. R. at 64. Hartman described the surgeries that S.M. had in March and September of the previous year. R. at 50. She explained that his condition was worse after the surgery. R. at 50.

If S.M. becomes sick at school, the school calls his mother. R. at 52. He will go home, or he can lay in the office for 30 minutes to see if it will go away. R. at 52. If he does not improve, they give him his medicine and then he goes home. R. at 52. Hartman testified that his grades had suffered because of his condition. R. at 53. She said he had excellent grades the previous year and average grades in the present year.

Hartman testified that she bathes S.M. R. at 63-64. She explained that when she tells him to take a bath, he will draw the water, but he will not bathe himself. R. at 63. She said that S.M. cannot prepare himself a snack and that she buys lunchables for him. R. at 63. She said he performs chores around the house like cleaning and dusting the furniture. R. at 61.

Hartman testified that S.M. takes albuterol for his asthma. R. at 50. She said that his asthma is out of control if he plays. R. at 51. She testified that he must use his inhaler about once a week. R. at 60. She said they have a nebulizer if his asthma gets bad, but that she had last used it about two months earlier. R. at 60.

Medical Records and Evaluations:

An ultrasound of the head was performed on June 19, 2013. R. at 243. Several lobular vascular channels were noted in the right temporal area. R. at 243. It was noted that this could represent a venous malformation or varicosities. R. at 243.

On July 12, 2013, S.M. presented to the Vascular Anomalies Clinic at Children's Hospital for evaluation of swelling over the right temporal area and right orbit. R. at 251. Dr. Hugo St. Hilaire observed some prominent veins in the right temporal lateral orbital area, with no pulsation or tenderness. R. at 251. Dr. St. Hilaire determined this was most likely a dilated vein from the anterior branch of the superficial temporal system and that no imaging was required. R. at 251. S.M. was referred to neurology for his headaches. R. at 251.

On August 26, 2013, S.M. presented at Ochsner with headaches that began one year earlier. R. at 276. He was seen by Dr. John K. Willis. R. at 276. The headaches had been occurring once or twice a week until he began taking Periactin 2mL at bedtime three weeks earlier, which had eliminated the headaches. R. at 276. It was noted that the headaches are frontal, last less than an hour, are associated with photophobia and phonophobia, and are probably improved with sleep. R. at 276.

S.M. presented to his pediatrician at Audubon Pediatrics on September 11, 2013, complaining of crying with headache and vomiting. R. at 261. He followed up with Dr. Willis on September 13, 2013, reporting that his headache had returned two days earlier. R. at 278. He had been diagnosed with acute sinusitis, received antibiotics, and was back to normal. R. at 278. Some change of mood with Periactin was reported, and this medication was discontinued. R. at 278.

S.M. followed up with Audubon Pediatrics for his headache on September 17, 2013 and again on September 24, 2013. R. at 259-60.

S.M. followed up with Dr. Willis on February 19, 2014 for migraines. R. at 281. He had run out of medications and his headaches had been occurring about once a week lasting an hour or two. R. at 281. He was prescribed amitriptyline 10mg at bedtime as a preventative agent and Fioricet tablets for acute headaches. R. at 281.

S.M. followed up for migraines with Dr. Willis on April 21, 2014. R. at 283. He was taking amitriptyline 10 mg twice daily and his headaches had reduced to once every two weeks. R. at 283. The headaches were relieved quickly with Fioricet. R. at 283. His dosage of amitriptyline was increased in hopes of getting further prophylaxis. R. at 283.

S.M. followed up with Dr. Willis on July 21, 2014, for migraines. R. at 285. He reported very few headaches until two weeks earlier when he had headaches for a week that were quickly relieved by Fioricet. R. at 285. He had not been taking the increased dosage of amitriptyline. R. at 285. His dosage of amitriptyline was increased again. R. at 285.

S.M. followed up with Dr. Willis on September 24, 2014. R. at 287. He reported that he still had headaches once or twice a week, somewhat relieved by Fioricet. R. at 287. Amitriptyline was discontinued, and he was prescribed verapamil as a preventative agent. R. at 287.

S.M. returned to Dr. Willis on October 24, 2014, and reported he was still having headaches two to three times a week. R. at 289. He reported the headaches are relieved by Fioricet, but that it makes him drowsy. R. at 289. Verapamil was discontinued, and he was prescribed Topamax at bedtime. R. at 289.

S.M. followed up with Dr. Willis on October 31, 2014, reporting almost daily headaches since his appointment a week earlier. R. at 291. His dosage of Topamax was increased to 50mg. R. at 291.

S.M. followed up for his headaches with Dr. Willis on December 3, 2014. R. at 374. He was still having headaches frequently, about three times a week. R. at 375. Topamax was discontinued, and phenobarbital was prescribed as a preventative agent. R. at 375. "Given the worsening picture," he was referred for an MRI of the cranium. R. at 375.

S.M. presented at Audubon Pediatrics on December 8, 2014, complaining of a bad headache, cold, and cough. R. at 321.

An MRI was performed on December 17, 2014 and showed Chari type 1 malformation with 2.3 cm of cerebellar protrusion into the foramen magnum and clear-cut local compression. R. at 384. S.M. was referred to neurosurgery. R. at 384.

On January 14, 2015, S.M. was seen by neurosurgeon Cuong J. Bui per Dr. Willis's referral. R. at 387. Dr. Bui noted that S.M. had been experiencing intermittent headaches with pain of 10 on a 10-point scale that had become more frequent. R. at 387. S.M. had already missed 11 days of school that school year as a result. R. at 387. Exacerbating factors were running around, cough, and light. R. at 387. His parents reported that his new medicine had been helping. R. at 387. S.M. had normal strength and no sensory deficit. R. at 389. His recent and remote memory, attention span, and concentration were normal. R. at 389. Dr. Bui described the Chiari malformation as "very significant." R. at 389. Dr. Bui concluded that "if Dr. Willis feels he has exhausted medical therapy, then I will favor Chiari decompression." R. at 389. An MRI of the C-spine was ordered to evaluate for syrinx. R. at 389.

S.M. followed up with Dr. Willis on January 21, 2015. R. at 392. S.M. continued to have daily headaches. R. at 392. Phenobarbital and Fioricet had not been helpful. R. at 392. Dr. Willis had spoken to Dr. Bui about evaluating S.M. for surgery to decompress his Chiari malformation "and hopefully relieve his symptoms." R. at 392.

6

S.M. presented at Audubon Pediatrics on February 23, 2015, for a pre-operative check-up. R. at 320. Diagnoses of headache, asthma, and Chiari malformation were noted. R. at 320. S.M. was examined by a physician's assistant in the neurology department on February 25, 2015, who cleared him for an MRI of the cervical spine under anesthesia. R. at 396. An MRI of the cervical spine was performed on February 25, 2015. R. at 390. Findings were consistent with Chiari type 1 malformation. R. a.t 399. No syrinx was identified. R. at 399.

S.M. followed up with Dr. Bui on February 25, 2015. R. at 403. He did not have a headache at the time of the appointment, but it was noted that he had a headache with pain of 10 out of 10 coming out of the MRI and required IV medication. R. at 404. Dr. Bui recommended admitting S.M. for intercranial pressure monitoring "and if pressures are elevated," a possible "shunt before consideration of the Chiari 1 operation." R. at 404.

S.M. presented for surgery at Ochsner on March 16, 2015 for placement of an external ventricular drain to monitor intracranial pressure R. at 407-09. The surgery was performed by Dr. Bui. R. a 415. S.M. tolerated the procedure well, and there were no intra-operative complications. R. at 408. Following the surgery, a CT of the head was performed on March 18, 2015. R. at 416. The ventriculoperitoneal shunt catheter could be seen entering from a right frontal approach. R. at 416. Only minimal prominence of the size of the latter ventricles and no significant intra or extra axial intracranial abnormality was appreciated. R at 416. S.M. was discharged on March 19, 2015. R. at 408.

S.M. followed up with Dr. Bui for a post-operative evaluation. R. at 420. S.M. had only had one minor headache since the operation. R. at 420. Dr. Bui did not plan to do anything further for the Chiari malformation as long as S.M. did not have a lot of headaches. R. at 422.

S.M. followed up with Dr. Willis on April 14, 2015, complaining that his headaches had returned in the last week and were occurring every day or two. R. at 424. The headaches were relieved by Fioricet. R. at 425. Dr. Willis concluded that S.M. should follow up with Dr. Bui. R. at 425.

S.M. was seen by Allison H. Conravey, MD, on May 11, 2015. R. at 428. S.M. reported having gone to the emergency room the previous week for extreme pain over the eye. R. at 428. S.M.'s mother reported they were seeking a second opinion from Dr. Conravey. R. at 428. Dr. Conravey reviewed medication overuse and emphasized limiting rescue medication to 2 to 3 times a week. R. at 430. Ibuprofen 400mg and/or Imitrex 50mg was prescribed for use at headache onset. R. at 430. He was limited to no more than three doses per week. R. at 430. He would be weaned off phenobarbital and Migrelief would be tried. R. at 430.

On June 3, 2015, S.M. followed up with Dr. Bui. R. at 434. S.M.'s intracranial pressure had been normal, and he had experienced a decrease in occurrence of headaches. R. at 434. S.M. reported that promethazine had improved his symptoms. R. at 434. Dr. Bui noted that the new medicinal regimen appeared to be working, and S.M. and his family were happy with the progress. R. at 435. Dr. Bui noted that S.M.'s headaches were "well controlled." R. at 435. Dr. Bui was not convinced that S.M.'s headaches are related to his Chiari malformation. R. at 435.

S.M. presented at Audubon Pediatrics on June 11, 2015, complaining of genital pain. R. at 319.

S.M. followed up with Dr. Willis on June 23, 2015. R. at 437. S.M. was experiencing headaches every other day. R. at 438. Dr. Willis referred S.M. back to Dr. Bui, noting that "he is quite symptomatic" and that "surgery should be reconsidered." R. at 438.

8

On June 25, 2015, S.M. was seen by H. Sprague Eustis, Jr., MD, who performed a special screening for neurological, eye, and ear diseases. R. at 442. Dr. Eustis noted normal health eyes, no disc edema, and normal vision. R. at 442.

S.M. was examined by pediatric urologist Aaron Martin, MD, in July 2015, for pain in his scrotum. R. at 331. In his July 10, 2015 report, Dr. Martin found it was unclear what pain S.M. was experiencing. R. at 331.

S.M. followed up with Dr. Bui on July 29, 2015. R. at 446. Intercranial pressure had been low, but S.M. had been experiencing mild to moderate headaches every other day, exacerbated by heat or light. R. at 446. S.M. reported missing a significant amount of school in the last year due to his headaches. R. at 446. An MRI scan of the brain showed slight prominence in the ventricle system. R. at 447. An MRI scan of the C-spine showed "pretty significant" Chiari malformation with cerebellar tonsils extending past C2. R. at 447. Dr. Bui described S.M. as "fairly symptomatic," and concluded that given the radiographic findings and his symptoms, S.M. would benefit from surgical intervention. R. at 447. In a note dated the same day, LPN Lakiesha Parks opined that S.M. could not participate in PE or any contact sports. R. at 300.

S.M. presented at Audubon Pediatrics on August 7, 2015 for a refill of Fioricet. R. at 318. The pediatrician noted that the medication had been prescribed by S.M.'s neurologist, but S.M.'s mother insisted that Audubon Pediatrics had previously prescribed it. R. at 318.

S.M. followed up with Dr. Willis on August 12, 2015 for renewal of his Fioricet prescriptions "which does relieve his frequent headaches." R. at 451. It was noted that S.M. was scheduled for surgery on September 10, 2015. R. at 451.

S.M. presented for "elective Chiari decompression" on September 10, 2015, and the surgery proceeded without complication. R. at 456, 458. Dr. Bui noted that the case warranted a

22 modifier because of the complexity of the Chiari 1 and tonsils being down past C2 "which is very unusual." R. at 459. S.M. was discharged on September 13, 2015, with a restriction of no lifting greater than 10 pounds and walking on paved surfaces only. R. at 306.

S.M. was seen by RN Ashley Chinn for a post-operative follow up on September 24, 2015 R. at 466. S.M.'s mother reported that he had not complained of headaches but has had occasional shoulder pain. R. at 466. S.M.'s mother asked whether he could have a laser tag birthday party, but Chin advised against that because of the dark room and the possibility of S.M. falling or getting knocked down. R. at 466.

S.M. presented at Children's Hospital on October 5, 2015, complaining of intermittent right knee pain and right shoulder pain. R. at 342. He was sent to physical therapy. R. at 343.

S.M. followed up with Dr. Bui on October 21, 2015. R. at 469. He had begun experiencing mild to moderate headaches three nights earlier. R. at 469. Dr. Bui noted that S.M. was doing very well overall, but he added that S.M. still may have some migraine type headaches, which would be followed by Dr. Willis. R. at 471.

S.M. followed up with Dr. Willis on October 29, 2015. R. at 473. S.M. reported three headaches lasting about 10 minutes over the last week. R. at 473. S.M. was bright and alert in the clinic. R. at 474. Dr. Willis concluded "I think [S.M.] is doing very well and I am delighted with the outcome of his repair." R. at 474.

S.M. presented at Audubon Pediatrics on November 2, 2015, complaining of cough and congestion. R. at 316. He was diagnosed with sinusitis. R. at 316.

A progress note from Children's Hospital dated December 15, 2015, reports S.M. followed up for left shoulder pain and right knee pain. R. at 337. His left shoulder pain was completely

resolved. R. at 337. His mother reported that "he is very active without limitations, but over the past months he has had two episodes of his 'legs giving out.'" R. at 337.

On January 20, 2016, S.M. followed up with Dr. Willis. R. at 476. Dr. Willis noted that since S.M.'s previous visit in October, he had had "occasional brief headaches." R. at 476. S.M. complained that during the past two weeks, he had experienced headaches lasting about thirty minutes occurring every other day. R. at 476. It was noted that S.M. has to leave school with these headaches and that for acute headaches he takes Fioricet and goes to sleep. R. at 476. Dr. Willis noted "I wonder whether there is some secondary gain here." R. at 476. Dr. Willis prescribed amitriptyline 10mg at bedtime as a preventative. R. at 477.

An MRI of the cervical spine was performed on February 25, 2016. R. at 484. There was no evidence of Chiari malformation or syringomyelia. R. at 485.

S.M. presented at Audubon Pediatrics on March 7, 2016, to follow up after his emergency room visit. R. at 315. He complained of a cough and runny nose. R. at 315. He was diagnosed with influenza and bronchitis. R. at 315. There is no record of the predicate emergency room visit.

S.M. followed up with Dr. Willis on March 9, 2016. R. at 489. The amitriptyline was not helpful and had only made S.M. sleepy. R. at 490. S.M. continued to have daily headaches lasting 1-2 hours, sometimes with vomiting and nausea. R. at 490. He would take Fioricet for the headaches, which makes him sleepy and then he sleeps off his headaches. R. at 490. Dr. Willis discontinued his medications and started him verapamil at bedtime as a preventative and Imitrex at the onset of a headache. R. at 490.

S.M. followed up with Dr. Willis on March 23, 2016. R. at 492. The verapamil had not really changed his daily headaches. R. at 493. S.M. was leaving school almost daily. R. at 493. Dr.

Willis questioned again whether this "represents secondary gain." R. at 493. Verapamil was discontinued, and Topamax was prescribed as a preventative. R. at 493.

S.M. followed up with Dr. Willis on April 20, 2016. R. at 495. S.M. reported headaches almost daily lasting about 30 minutes and sometimes repeating. R. at 496. S.M.'s mother reported that the school calls her at least every other day to come pick up him and his grades are dropping. R. at 496. Dr. Willis noted "I questioned whether some of this represents secondary gain," but he added that "I am not surprised that he would have brief headaches occasionally given the extent of his surgical repair." R. at 496. Dr. Willis reported that he had written a note to see if S.M. can stay in school "with these rather brief headaches." R. at 496. Topamax was discontinued because it seemed to affect S.M.'s cognition, and Tegretol was prescribed as a preventative. R. at 496.

S.M. followed up with Dr. Conravey on May 19, 2016. R. at 499. S.M. reported daily headaches that were worse with exercise. R. at 499. Dr. Conravey prescribed pediatric Migrelief as a prophylaxis and noted that Neurontin would be considered in the future. R. at 500. S.M. was referred for Botox. R. at 500.

Teacher Evaluations

S.M.'s first grade teacher, Mrs. Trosclair, filled out a Social Security Administration Teacher Questionnaire on December 2, 2014. R. at 175, 182. She reported that S.M. had an unusual degree of absenteeism because he checks out often due to his headaches. R. at 175. She reported that he complains of headaches weekly, almost daily. R. at 181-82. Mrs. Trosclair reported that S.M. has no problems with acquiring and using information. R. at 176. He is in the regular education classroom and does not get or need extra help. R. at 176. She reported that he gets good grades and is a good reader. R. at 176. In the domain of attending and completing tasks, Mrs. Trosclair reported slight problems with paying attention when spoken to directly, waiting to take

turns, changing from one activity to another without being disruptive, and working without distracting self and others. R. at 177. She reported no problems with focusing on a task, carrying out instructions, organizing things, completing assignments, completing work accurately and without careless mistakes, and working at a reasonable pace. R. at 177. In the domain of interacting and relating with others, she reported only slight problems playing cooperatively, asking permission appropriately, following rules, and taking turns in a conversation. R. at 178. She reported no problems making and keeping friends, seeking attention appropriately, expressing anger appropriately, respecting adults in authority, relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, and using adequate vocabulary and grammar to express thoughts and ideas. R. at 178. She noted that he is completely independent. R. at 178. She reported he has no problems interacting and relating with others, moving about and manipulating objects, or caring for himself. R. at 179-80.

During the 2015 -2016 school year, when S.M. was in second grade, he earned grades of As, Bs, and Cs. R. at 214. Tracking his surgery dates, S.M.'s school record indicates hospital/homebound services began March 20, 2015 through May 27, 2015, and from September 15, 2015, through December 4, 2015. R. at 228. His attendance record for the 2015-2016 school year shows 19 excused absences and 28 "late to school/early departure." R. at 219. This does not include any absences between September 17, 2015, and December 8, 2015 when it appears he would have been receiving homebound services. R. at 219. There were three disciplinary referrals in his record for talking and being disruptive and disrespectful in class during the 2015-2016 school year. R. at 220-22.

His second-grade teacher, Latoya Williams, also filled out a Social Security Administration Teacher Questionnaire on May 18, 2016. R. at 232, 239. She reported no problems in acquiring and using information. R. at 233. In the domain of attending and completing tasks, she reported a slight problem focusing long enough to finish an activity and an obvious problem changing from one activity to another without being disruptive and working without distracting self or others. R. at 234. She reported no problems paying attention when spoken to, sustaining attention, refocusing to task when necessary, carrying out instructions, waiting to take turns, organizing things, completing assignments, completing work accurately without careless mistakes, and working at a reasonable pace. R. at 234. In the domain of interacting and relating with others, Ms. Williams reported a slight problem using language appropriate to the situation and listener and an obvious problem seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules, and respecting authority. R. at 236. She reported a serious problem with introducing and maintaining relevant and appropriate topics of conversation and taking turns in a conversation. R. at 236. She reported no problems with playing cooperatively with other children, making and keeping friends, relating experiences and telling stories, interpreting meaning of facial expression, body language, hints, or sarcasm, or using adequate grammar and vocabulary to express throughs and ideas. R. at 236. She reported no problems interacting and relating to others, moving about and manipulating objects, or caring for himself. R. at 235, 237. She reported that S.M. has severe headaches often—at least once a week—and he is unable to complete any work or concentrate when he gets the headaches. R. at 238. She noted that he checks out of school often due to these headaches and that his medication makes him drowsy. R. at 238. \

Disability Records

The state examiner reviewed S.M.'s records and evaluated him in the six functional domains. R. at 63. The report, dated December 16, 2014, found no limitation in the domains of acquiring or using information, attending and completing tasks, interacting and relating with others, moving about and manipulation of objects, or caring for oneself. R. at. 73-74. The examiner found less than marked impairment in health and physical well-being, explaining that S.M. continues to have some issues with headaches. R. at 74. [2]

## Decision of the Administrative Law Judge

The ALJ determined that because S.M. was born on October 10, 2007, he was a school-age child on the date the application was filed and on the date of the ALJ's decision. The ALJ determined that S.M. had not engaged in substantial gainful activity since the application date. The ALJ found S.M. has the following severe impairment: Chiari malformation. The ALJ found that S.M. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[2] The record before this court also includes evidence that was submitted by S.M. to the Appeals Council, but which was not considered by the Appeals Council because the records concern the time period after the ALJ's decision on July 27, 2016. This new evidence includes the opinion of Liudmila Lysenko, MD, dated November 11, 2016, which reports that S.M was diagnosed with narcolepsy and was undergoing treatment in the Ochsner sleep center. R. at 19. The opinion explains that narcolepsy is "characterized by excessive daytime sleepiness, which may result in . . . sleepiness, and sleep attacks (episodes of falling asleep without warning)." R. at 19. Dr. Lysekno recommended that S.M. would require increased time for class work, permission to chew gum and have candy/soda during class, extra breaks if needed. R. at 19. It was also requested that S.M. be excused for "occasional absence from school due to narcolepsy." R. at 19.

The new evidence also includes two school records. S.M.'s Individual Accommodation Plan, dated February 20, 2017, noted ADHD, chronic fatigue syndrome, and migraine headaches. R. at 8, 13. Accommodations included increased time for classroom (time and a half) and breaks during work periods or between tasks. R. at 9. And a Terrebonne Parish School District Behavior Assessment/Behavior Management Plan dated April 6, 2017, noted the following target behaviors "rude/disrespectful" and "outburst/excessive talking." R. at 14. Notes explain that when S.M. is "corrected or cannot have his way, he will leave the classroom and his behavior escalates. He begins ranting very loudly (habitually disturbing instruction) and talks disrespectfully to adults." R. at 14.

As noted, this evidence was not considered by the Appeals Council. Further, in their respective motions for summary judgment, neither the plaintiff nor the Commissioner refer to this evidence.

The ALJ found that S.M. does not have an impairment or combination of impairments that functionally equals the severity of the listings. In assessing functional equivalence, the ALJ found S.M. has no limitation in the domain of acquiring and using information; less than marked limitation in attending and completing tasks; less than marked limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in ability to care for himself; and less than marked limitation in health and physical well being. The ALJ concluded that S.M. has not been disabled under the act since the date of application on September 22, 2014.

## Statement of Issues on Appeal

Issue No. 1.    Does substantial evidence support the ALJ's finding that S.M.'s impairment did not functionally equal a listed impairment?

## Analysis

### I.  Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

A child under the age 18 is "disabled" under the Act if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; see 20 C.F.R. § 416.924. It is the claimant's burden to prove that he meets the definition of disabled. Fraga v. Bowen, 810 F.2d 1296, 1301–02 (5th Cir. 1987).

The ALJ employs the following three-step sequential process in evaluating childhood disability cases:  (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a severe impairment or combination of impairments; and (3) whether the severe impairment(s) meets, medically equals, or functionally equals the severity of any impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "listings"). Id. § 416.924(a)-(d). In evaluating functional equivalence at step three, the ALJ considers how a child functions in his activities in terms of six domains of functioning. Id.  § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-

being. Id.  Functional equivalence means that the impairment is of listing-level severity and results in "marked" limitations in two of the six domains of functioning or an "extreme" limitation in one domain. Id. § 416.926a(a). A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(2).   Of relevance to the present appeal, in the domain of "health and physical well-being," the Commissioner

> may also consider [the claimant] to have a "marked" limitation if [the claimant is] frequently ill because of [his] impairment(s) or [has] frequent exacerbations of [his] impairment(s) that result in significant, documented symptoms or signs. For purposes of this domain, 'frequent means that [the claimant has] episodes of illness or exacerbations that occur on an average of 3 times a year, or once every 4 months, each lasting 2 weeks or more. We may also find that [the claimant has] a "marked" limitation if [the claimant has]  episodes that occur more often than 3 times in a year or once every 4 months but do not last for 2 weeks, or occur less often than an average of 3 times a year or once every 4 months but last longer than 2 weeks, if the overall effect (based on the length of the episode(s) or its frequency) is equivalent in severity.

Id. § 416.926a(e)(2)(iv). An "extreme" limitation interferes *very* seriously with the child's ability to independently initiate, sustain, or complete activities. Id. § 416.926a(e)(3)(i) (emphasis added). It is the rating given to "the worst limitations," but it 'does not necessarily mean a total lack or loss of ability to function." Id.   In the domain of "health and physical well-being," the Commissioner

> may also consider [the claimant] to have an "extreme" limitation if [the claimant is] frequently ill because of [his] impairment(s) or [has] frequent exacerbations of [his] impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a "marked" limitation in paragraph (e)(2)(iv) of this section. However, if [the claimant has] episodes of illness or exacerbations of [his] impairment(s) that we would rate as "extreme" under this definition, [the claimant's] impairment(s) should meet or medically equal the requirements of a listing in most cases.

Id. § 416.926a(e)(3)(iv). The regulations provide a non-exhaustive list of examples of impairments that functionally equal the listings:

(1) Any condition that is disabling at the time of onset, requiring continuing surgical management within 12 months after onset as a life-saving measure or for salvage or restoration of function, and such major function is not r estored or is not expected to be restored within 12 months after onset of this condition.

(2) Effective ambulation possible only with obligatory bilateral upper limb assistance.

(3) Any physical impairment(s) or combination of physical and mental impairments causing complete inability to function independently outside the area of one's home within age-appropriate norms.

(4) Requirement for 24–hour–a–day supervision for medical (including psychological) reasons.

(5) Major congenital organ dysfunction which could be expected to result in death within the first year of life without surgical correction, and the impairment is expected to be disabling (because of residual impairment following surgery, or the recovery time required, or both) until attainment of 1 year of age.

Id. § 416.926a(m).

The regulations require use of the "whole child" approach, which means that before analyzing each domain, the decision maker first considers how the child's functioning is affected during all of the child's activities. 20 C.F.R. § 416.926a(b); Id. § 416.926a(c); Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule-the "Whole Child" Approach, SSR 09-1P (S.S.A. Feb. 17, 2009). As explained in the regulations,

Any given activity may involve the integrated use of many abilities and skills; therefore, any single limitation may be the result of the interactive and cumulative effects of one or more impairments. And any given impairment may have effects in more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s).

20 C.F.R. § 416.926a(c).


I.    **Plaintiff's Appeal**.

Issue No. 1.    Does substantial evidence support the ALJ's finding that S.M.'s impairment did not functionally equal a listed impairment?


As noted above, to functionally equal a listed impairment, the impairment must result in marked limitations in two domains of functioning or extreme limitation in one domain. Plaintiff

argues that S.M. suffers from extreme limitation in the domain of "health and physical well-being." Plaintiff insists that the record shows that S.M. has had frequent exacerbations of his impairments. Plaintiff points to S.M.'s two surgeries and the documentation by his teachers that he has missed numerous days of school due to his medical conditions. Plaintiff also describes S.M.'s treatment history with Dr. Willis and the July 29, 2015, note limiting S.M. from participating in PE or any contact sports.

The Commissioner counters that the record does not document an impairment that rises to the level of functional equivalence. The Commissioner argues that multiple surgeries and missing school for numerous days does not rise to the level of an extreme limitation under the regulations. The Commissioner submits that S.M.'s impairments are not like the examples of impairments that functionally equal a listing (e.g., need for major organ transplant, complete inability to function independently, or need for 24-hour-a-day medical supervision). The Commissioner describes S.M.'s headaches as infrequent and points out that the Chiari decompression surgery was characterized as "elective."

The Commissioner cites Bowie ex rel. Bowie v. Barnhart, where the Fifth Circuit affirmed a magistrate judge's finding that substantial evidence supported the ALJ's determination that the claimant suffered from less than a marked impairment in all six functional domains. 194 F. App'x 241, 242 (5th Cir. 2006) (unpublished). But Bowie does not assist the Court here, where the domain of health and physical well-being is at issue, because Bowie did not specifically discuss that domain. Moreover, it is unclear from the written opinion in Bowie what symptoms the claimant suffered. Although there is some indication that the claimant suffered from congenital kidney disease and kidney cancer and that she alleged learning problems and side-effects from immune-suppressants, there is little description of the medical records or functional impairments resulting

from these conditions. Id. at 243 n.1. Without more details of the symptoms, it is not possible to compare the Bowie claimant's impairments to S.M.'s impairments.

The court has found one case with similarities to the present. In Wiltz v. Barnhart, the Western District of Louisiana found that frequent, severe headaches that caused the claimant to be unable to attend school required a finding of extreme limitation in the domain of health and physical well-being, and therefore, a finding of disability. 484 F. Supp. 2d 524, 533 (W.D. La. 2006). The record in Wiltz showed the claimant had consistently sought treatment for migraines and had been prescribed medication for the condition. Id. The record reflected that in one school year the claimant's physician sent medical notes excusing the claimant from over 24 days of school due to headaches and ordering him to be placed on homebound educational status for twelve weeks. Id. at 529. The claimant required home schooling for some of the next (his junior) year, and his entire senior year of high school. Id. His treating physician opined that "[d]espite aggressive management efforts, his headaches have progressed to the point of substantially limiting his activities . . . . His condition may improve with continued management but now, and for the foreseeable future, he is incapacitated by his disease." Id. at 528-29. Upon review, the magistrate judge found that because the claimant's headaches "limited him from day-to-day functioning in a school environment, [the claimant] had an extreme limitation in the domain of 'health and well-being.'" Id. at 533. No objections were filed, and the district court adopted the report and recommendation. Id. at 525.

Here, the ALJ found that S.M. has less than marked limitation in the domain of health and physical well-being. The ALJ assessed the medical records before her and found that S.M. suffers from headaches that vary in frequency and intensity. She noted that throughout his medication changes, his headaches were consistently relieved by Fioricet. The ALJ noted the side effect of

drowsiness but observed that S.M. has friends over daily because he does not like to be left alone. In assessing the domain of health and physical well-being, the ALJ concluded that S.M. suffers from migraines that are controlled with medication. Although he is often drowsy when he takes his medication, the ALJ determined the phenomenon occurs with varying frequency. The ALJ considered that the State Agency medical consultant had opined that S.M. has less than marked limitation in this domain. In her earlier assessment of the State Agency medical consultant's opinion, the ALJ assigned it partial weight, noting that records submitted subsequently showed that S.M. had undergone two operations and reported side effects of drowsiness due to medications.

Plaintiff insists that the ALJ erred because S.M. suffers from extreme limitations in the domain of health and physical well-being. Although S.M. suffers from headaches and drowsiness and sometimes misses school, the ALJ's conclusion is supported by substantial evidence. At best, the evidence might support a finding that S.M. has a marked limitation in the domain of health and physical well-being, but this would still not be enough to find that S.M. is disabled.

In coming to her conclusions, the ALJ considered the information now cited by the plaintiff, including S.M.'s surgeries, his treatment with Dr. Willis, his complaints of headaches, and his complaints of drowsiness from his medication. The ALJ determined the headaches and drowsiness did not occur with sufficient frequency and consistency to support a finding of marked or extreme limitations. The ALJ also considered the July 29, 2015, note by LPN Parks limiting S.M. from participating in PE or any contact sports, but the ALJ concluded that Parks is not an acceptable medical source under the regulations and that her opinion was inconsistent with S.M.'s reported activities.  The ALJ had previously noted S.M.'s ability to perform chores like cleaning and dusting furniture.

Importantly, unlike in the <u>Wiltz</u> case, there is no opinion of a treating physician finding S.M. "substantially" limited in his activities and "incapacitated by his disease." Although S.M.'s school records show many absences and late arrivals or early departures, unlike in <u>Wiltz</u>, there are no doctor's notes to excusing these absences for headaches, so it is unclear how many are attributable to his headaches. Nor does the record show that S.M.'s headaches resulted in a complete inability to attend school for more than one school year, as with the claimant in <u>Wiltz</u>. The reports of S.M.'s teachers indicate weekly or daily early departures, yet, S.M.'s grades remained average or above average. His treating physician Dr. Willis also questioned, on at least three occasions, whether there was a secondary gain motivating the departures.

Plaintiff argues that S.M. suffers frequent exacerbations. As noted above, in the domain of health and physical well-being, exacerbations may be considered marked if they occur "more often than 3 times in a year or once every 4 months but do not last for 2 weeks." 20 C.F.R. § 416.926a(e)(2)(iv). To qualify as extreme, there must be "documented symptoms or signs *substantially in excess* of the requirements for showing a 'marked' limitation." <u>Id.</u>    § 416.926a(e)(3)(iv) (emphasis added). Additionally, the regulations provide that "if [the claimant has] episodes of illness or exacerbations of [his] impairment(s) that we would rate as 'extreme' under this definition, [the claimant's] impairment(s) should meet or medically equal the requirements of a listing in most cases." <u>Id.</u> Here, the ALJ found that S.M.'s impairments do not meet or medically equal the requirements of a listing.  The plaintiff does not challenge this finding.

The court finds that substantial evidence supports the ALJ's determination that S.M. does not suffer from extreme impairments in the domain of health and physical well-being. Thus, the ALJ's finding that S.M. is not disabled is supported by substantial evidence, and the decision of the ALJ should be affirmed.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 13) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 14) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 28th day of December, 2018.

Janis van Meerveld
United States Magistrate Judge

24